## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Marla N. Jahnke, M.D.,

                    Plaintiff,          Case No. 24-10274

v.

                                    Judith E. Levy
                                    United States District Judge

Unum Life Insurance Company of
America and Provident Life and              Mag. Judge Anthony P. Patti
Accident Insurance Company,

                    Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT BASED ON THE ADMINISTRATIVE RECORD AND MOTION TO DIMISS PLAINTIFF'S STATE-LAW CLAIM [15] AND GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND TO REVERSE THE PLAN ADMINISTRATOR'S DECISION [16]**

Before the Court are Defendants' Motion for Judgment Based on

the Administrative Record and Motion to Dismiss Plaintiff's State-Law

Claim ("Defendants' Motion"), (ECF No. 15), and Plaintiff's Motion for

Judgment on the Administrative Record and to Reverse the Plan

Administrator's Decision ("Plaintiff's Motion"). (ECF No. 16.) For the

reasons set forth below, Defendants' Motion is granted in part and denied in part, and Plaintiff's Motion is granted.

## I.   Background

Plaintiff is a pediatric dermatologist who has suffered from a variety of symptoms following the birth of her second child in June 2019. Defendants, which are two insurance companies owned by the Unum Group, initially paid Plaintiff disability benefits but terminated those benefits on December 16, 2021, after finding that she was no longer disabled as defined by her policies as of December 1, 2021. (ECF No. 11-16, PageID.4441, AR at 4184.) That denial led the present litigation.

When Plaintiff initially applied for benefits, she informed Defendants that she had severe nausea and vomiting during both of her pregnancies and that her second pregnancy in 2018 was particularly difficult. (ECF No. 11-2, PageID.617, AR at 0360.) During her second pregnancy, she stopped working, was hospitalized twice, and was required to be on bedrest for 8 months. (*Id.*; ECF No. 11-8, PageID.2243, AR at 1986.) After Plaintiff gave birth to her second child in June 2019, she reported pelvic pain and difficulty working for more than three hours when she returned to work in September 2019. (ECF No. 11-2,

PageID.617, AR at 0360.) She limited her time at work to three hours per day for two to three days a week. (*Id.*) In October 2019, Plaintiff claimed disability benefits under her policies with Defendants, citing her hyperemesis gravidarum (a severe type of nausea and vomiting during pregnancy), pelvic floor dysfunction, sacroiliac joint disfunction, and generalized weakness. (*Id.* at PageID.407, AR at 0150.)

Plaintiff made claims under two policies, both of which are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001, *et seq.* Her policy with Defendant Unum Life Insurance Company of America ("Unum") was a long-term disability benefit policy (the "Unum Policy") available through her employer, Henry Ford Health System. (ECF No. 11-1, PageID.212, AR at 0002.) The Unum Policy defines disability as occurring when:

> -you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and

> - you have 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury

(*Id.* at PageID.226, AR at 0016 (emphasis in original).)

3

Through Defendant Provident Life and Accident Insurance Company ("Provident") Plaintiff had a second policy (the "Provident Policy"). Under that policy,

> [r]esidual Disability or residually disabled, during the Elimination Period, means that due to Injuries or Sickness:
>
> 1. you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;
>
> 2. you have a Loss in Monthly Income in your occupation of at least 20%; and
>
> 3. you are receiving care by a Physician which is appropriate for the condition causing disability. We will waive this requirement when continued care would be of no benefit to you.
>
> After the Elimination Period has been satisfied, you are no longer required to have a loss of duties or time. Residual Disability or residually disabled then means that as a result of the same Injuries or Sickness:
>
> 1. you have a Loss of Monthly Income in your occupation of at least 20%; and
>
> 2. you are receiving care by a Physician which is appropriate for the condition causing the Loss of Monthly Income. We will waive this requirement when continued care would be of no benefit to you.

4

(ECF No. 12-1, PageID.6056–6057, AR at 0011–0012.) The elimination period for the Provident Policy is 365 days. (*Id.* at PageID.6049, AR at 0004.)

Although Defendants initially approved Plaintiff's claims and began paying them, they later followed up and stated that they would continue paying her benefits but would do so "under Reservation of Rights," meaning they would continue making payments on a contingent basis until the completion of their review of her claims. (ECF No. 11-7, PageID.1805, AR at 1548.)

Plaintiff has received a variety of medical treatments and evaluations during the period relevant to this litigation. On November 1, 2019, she had an x-ray of her sacrum and coccyx, which revealed degenerative changes within the sacroiliac joint, the spine, and the pubic symphysis. (ECF No. 11-8, PageID.2247, AR at 1990.)

On November 23, 2019, Plaintiff's treating physician, Dr. Lauren Eichenbaum, who works in physical medicine and rehabilitation, stated that Plaintiff had physical restrictions and limitations requiring her to avoid prolonged sitting and standing, avoid lifting over 10 pounds, and limit sitting and standing to 20 minutes at a time. (ECF No. 11-2,

PageID.350, AR at 0093.) Dr. Eichenbaum noted that she would reevaluate Plaintiff the following month. (*Id.*) A nurse clinical consultant for Unum agreed with Dr. Eichenbaum, noting that despite an unknown etiology, the recommended restrictions and limitations were supported. (ECF No. 11-7, PageID.1604–1605, AR at 1347–1348.)

On December 16, 2019, along with referencing several improvements, Dr. Eichenbaum noted that Plaintiff's strength was "5/5 throughout all four extremities" but stated that she should get an MRI and continue with physical therapy. (ECF No. 11-7, PageID.1636, AR at 1379.) On January 20, 2020, however, Dr. Eichenbaum's notes indicate that Plaintiff had difficulty transitioning from sitting to standing, going up stairs, and lifting her children, though Plaintiff's pain had moderately improved. (*Id.* at PageID.1634, AR at 1377.) By March 27, 2020, Plaintiff had begun pool therapy with minimal improvements, and she continued to report physical difficulties. (*Id.* at PageID.1633, AR at 1376.)

Plaintiff decided to change doctors and informed Defendants she was dissatisfied with Dr. Eichenbaum. (*Id.* at PageID.1828, AR at 1571.) COVID had interrupted Plaintiff's physical therapy and had forced her to confer with Dr. Eichenbaum remotely. (*Id.*) Despite that, Dr.

6

Eichenbaum called Plaintiff in May 2020 and stated that she "couldn't see justifying her being out [of the workplace] beyond 06/01/20." (*Id.*) Plaintiff found this shift to be sudden and unsupported, so she reached out to Defendants to find out what information they would need if she switched to a new doctor. (*Id.*) Defendants provided Plaintiff with the information she requested. (*Id.* at PageID.1829, AR at 1572.)

Plaintiff began to see Dr. Laura Mattson, who works in physical medicine and rehabilitation. Dr. Mattson recommended the following restrictions for a three-month period, starting on July 24, 2020:

- No lifting greater than 5 lbs.

- No bending or twisting.

- Can stand continuously for 5-10 minutes at a time.

- Can sit continuously for 5-10 minutes at a time.

- Must have the ability to take frequent breaks as needed throughout the day [ . . .]

-Can resume working the following alternating schedule:

> Week A- 90 minutes at a time 2/7 days telemedicine only

> Week B- 90 minutes at a time 1/7 days telemedicine, 90 minutes at a time 1/7 days in the office

(ECF No. 11-9, PageID.2304, AR at 2047.)

In November 2020, Defendants hired an investigator to surveil Plaintiff for several days because they were skeptical that she was living up to the restrictions and limitations her doctor had imposed, but the investigator never observed her outside of her home. (ECF No. 11-11, PageID.3099–3111, AR at 2842–2854.)

Defendants also had a consultant conduct a vocational review. He concluded that Plaintiff was performing her occupational duties "in a reduced capacity" and that there was a "significant decline in production when comparing the pre and post-disability periods." (ECF No. 11-11, PageID.3121, AR at 2864.)

On December 22, 2020, Dr. Mattson noted Plaintiff's ongoing pain, referencing myofascial restrictions, maladaptive movement patterns, and likely left sacroiliac joint dysfunction. (ECF No. 11-13, PageID.3328–3329, AR at 3071–3072.) She indicated that various examinations led her to be optimistic about Plaintiff gaining function and independence. (*Id.* at PageID.3329, AR at 3072.) Dr. Mattson renewed Plaintiff's work restrictions for three more months, however. (*Id.*) She stated that she hoped Plaintiff would be able to transition back to increased work after she returned from a vacation in Florida where she planned to engage in

8

aquatic exercise as part of her recovery. (*Id.* at PageID.3328–3329, AR at 3071–3072.) Depending on Plaintiff's condition, Dr. Mattson believed the restrictions she had imposed on Plaintiff could "likely be liberalized" in the future. (*Id.* at PageID.3329, AR at 3072.)

On March 12, 2021, Defendants retained Dr. Joseph Antaki to complete a review of the restrictions and limitations Plaintiff's doctors had imposed. He determined that they were not supported by her condition. Dr. Antaki recognized that Plaintiff had pain and stiffness, but he noted times where she appeared to be able to "perform the motor activities involved with her occupation" such as initially being able to stand for an hour or two after her pregnancy, lifting her children when necessary, and lifting light or medium weights when "conveniently placed." (*Id.* at PageID.3471; AR at 3214.) Further, he opined that Plaintiff's records did not "support the presence of a neuromuscular, metabolic, or rheumatologic condition that would support" the restrictions imposed by her doctor. (*Id.*)

Defendants informed Plaintiff that they did not have records of any provider that was currently certifying her work restrictions and limitations. (*Id.* at PageID.3474, AR at 3217.) Plaintiff responded that

9

she was now seeing Dr. Reina Nakamura rather than Dr. Mattson, and she had cancelled an appointment with another doctor due to a COVID surge and had not rescheduled. (*Id.* at PageID.3478, AR at 3221.)

Plaintiff saw Dr. Nakamura by video on March 15, 2021, and then had an in-person visit on April 2, 2021. (*Id.* at PageID.3686–3692, AR at 3429–3435.) She began seeing Dr. Nakamura rather than Dr. Mattson, because Dr. Mattson completed her medical residency and was therefore no longer available. (*See id.* at PageID.3686, AR at 3429.) Dr. Nakamura indicated that Plaintiff's strength measurements were "5/5" and she noted normal MRIs. (*See id.* at PageID.3687–3688, AR at 3430–3431.) However, she stated that "it is not unreasonable to consider a more systemic cause for her symptoms." (*Id.* at PageID.3688, AR at 3431.) Dr. Nakamura later informed a consultant for Defendants that her opinion was that Plaintiff "would not have the endurance to sustain work activity." (*Id.* at PageID.3796, AR at 3539.) Dr. Nakamura did not identify a specific condition as the basis of Plaintiff's "fatiguability," but

she expressed concern that overexertion would slow Plaintiff's progress.[1]

(*Id.*)

During a June 7, 2021 video appointment with Dr. Margaret Swenor, who works in functional medicine, Dr. Swenor noted some improvements from physical therapy, though she also noted that Plaintiff had difficulty sitting and pain in the coccyx area. (ECF No. 11-16, PageID.4300, AR at 4043.)

Dr. Chijoke Nwagwu, Plaintiff's most recent doctor who works in physical medicine and rehabilitation, provided Defendants with a statement on November 11, 2021, where he stated that:

> [Plaintiff] is limited to working 90 mins/day, two days/week. 3/4 sessions are telemedicine from home and 1/4 (twice per month) in her office as a physician. She is to avoid prolonged sitting (max 30 min), prolonge[d] standing (max 30 mins), avoid lifting greater than 10 lbs. She is limited by difficulty with bending, twisting, reaching, limited walking tolerance.

(ECF No. 11-16, PageID.4356, AR at 4099.) He certified these restrictions and limitations until the end of 2022. (*Id.*)

---

[1] Plaintiff planned to begin seeing Dr. James Richardson after her visits with Dr. Nakamura, because he had a specialty in disabling conditions. (ECF No. 11-13, PageID.3796, AR at 3539.) Defendants were unable to contact Dr. Richardson, and Plaintiff never had a physical exam with him. (ECF No. 11-17, PageID.4996, AR at 4739.)

11

When Dr. Nwagwu spoke to Dr. Antaki, a medical consultant for Defendants, on November 29, 2021, he stated that Plaintiff's long bedrest was likely to have caused significant loss of muscle mass, creating a "myopathy that [Plaintiff] has been slow to recover from." (*Id.* at PageID.4397, AR at 4140.) Dr. Antaki rejected Dr. Nwagwu's position based on his reading of the record. (*Id.* at PageID.4396, AR at 4139.)

In a November 17, 2021 record review, Dr. Antaki referenced evidence in the record that Plaintiff had a normal gait, full range of movement, full strength in her lower extremities, and negative muscle screening tests. (*Id.* at PageID.4393–4394, AR at 4136–4137.) He opined that "intact strength, [range of movement], and absence of atrophy" are "not consistent with the presence of a medical condition that supports" any restrictions and limitations. (*Id.* at PageID.4394, AR at 4137.) He did not recommend referring Plaintiff for an independent medical examination, because he believed his disagreement with Plaintiff's doctors was about the interpretation of data that was already available. (*Id.*)

Defendants then had another physician, Dr. Arlen Green, review Plaintiff's records. He concluded that Plaintiff "has had activities

12

(driving, traveling), and exam findings and testing, that do not support restrictions and limitations." (ECF No. 11-16, PageID.4420, AR at 4163.) He also stated that Plaintiff "does not have any dangerous pathology or significant abnormality preventing the ability to function within the occupational demands described." (*Id.* at PageID.4421, AR at 4164.) He acknowledged Plaintiff's joint issues, however, including discomfort, compression, and hypermobility. (*Id.*)

Around the same time as Dr. Green's review, Plaintiff saw Dr. Jay Sandweiss, who focuses on osteopathic manipulative medicine. Plaintiff had met with Dr. Sandweiss previously, but during a November 30, 2021 appointment, Dr. Sandweiss noted that over their five visits Plaintiff only reported "modest improvements" that she was "overall . . . unable to maintain in any substantial way." (ECF No. 11-17, PageID.4788, AR at 4531.) He also stated that hypermobility was a potential cause of the muscle tension along with "chronic pain of multiple regions" that she was experiencing. (*Id.*)

In response to an inquiry from Defendants, Plaintiff left a phone message on December 13, 2021, stating that she had not asked Dr. Swenor to certify any restrictions or limitations. (ECF No. 11-16,

PageID.4430, AR at 4173.) She said Dr. Swenor was aware the of the restrictions and limitations and that Dr. Swenor was "supportive." (*Id.*) A December 13, 2021 note in Unum's files recommended reaching out to Dr. Swenor to confirm whether she was certifying any restrictions or limitations on Plaintiff. (*Id.* at PageID.4434, AR at 4177.) If Dr. Swenor did not certify any restrictions or limitations, the note recommended closing Plaintiff's disability claim. (*Id.*) Defendants called Dr. Swenor on December 16, 2021. Dr. Swenor's assistant stated on Dr. Swenor's behalf that Dr. Swenor did not get involved with disability issues and would have expected them to contact Dr. Nwagwu who she believed was the doctor certifying restrictions and limitations. (*Id.* at PageID.4437, AR at 4180.)

Shortly after the conversation with Dr. Swenor's office, Defendants reached out to Plaintiff about the forthcoming denial of her claim. (*Id.* at PageID.4438, AR at 4181.) A letter informing Plaintiff that Defendants would discontinue her benefits payments and close her claims was sent on December 16, 2021. (*Id.* at PageID.4440, AR at 4183.)

Plaintiff appealed Defendants' decision. She submitted numerous letters of support from her physicians. Dr. Swenor submitted a letter,

14

dated April 18, 2022, stating that Plaintiff had "pubic symphysis separation," which can cause "diffuse core, trunk, and lower extremity weakness." (ECF No. 11-17, PageID.4978, AR at 4721.) She also stated that Plaintiff had "mitochondrial dysfunction [and] chronic muscle weakness with instability." (*Id.*) Dr. Swenor confirmed that she supported restrictions and limitations on Plaintiff and that she should be granted disability benefits. (*Id.* at PageID.4978–4979, AR at 4721–4722.) She explained that she did not certify restrictions and limitations previously because she was deferring to Dr. Nwagwu given his specialization. (*Id.* at PageID.4979, AR at 4722.) Dr. Sandweiss also wrote a letter on Plaintiff's behalf referencing issues with hypermobility, instability, and a possible "mitochondrial/muscle syndrome" suggested by certain laboratory tests. (*Id.* at PageID.4972, AR at 4715.) In May 2022, he recommended that she take two to four months off work, and he said that her "multiple medical conditions" required a reduced work schedule. (*Id.*) Letters from a physical therapist set forth evidence of serious issues with endurance, as well as muscle imbalances and weaknesses, among other things. (ECF No. 11-19, PageID.5321, AR at 5064.) The physical therapist recommended activity limitations for Plaintiff. (*Id.* at

15

PageID.5322, AR at 5065.) Another physical therapist who has worked with Plaintiff since October 19, 2019 expressed similar views. (*Id.* at PageID.5324–5326, AR at 5069.) Plaintiff included charts of the care and physical therapy she had received since June 2019, demonstrating the extent and complexity of the care she has pursued. (*Id.* at PageID.5343, 5345, AR at 5086, 5088.)

Defendants also retained a vocational rehabilitation consultant to review Plaintiff's appeal, specifically with respect to whether categorizing Plaintiff as a pediatric dermatologist rather than a dermatologist would support Plaintiff's appeal. (ECF No. 11-19, PageID.5369, AR at 5112.) That consultant determined that Plaintiff "would not work alone and would have assistance while working with children." (*Id.*)

Defendants also reached out to Dr. Sandweiss who deferred to Plaintiff's other providers rather than stating whether Plaintiff could perform her occupational demands on a full-time basis as of December 1, 2021, and whether a medical condition would have prevented Plaintiff from doing so. (ECF No. 11-19, PageID.5403, AR at 5146.)

Defendants then asked Dr. Scott Norris to perform another review of Plaintiff's file. He rejected the arguments in her appeal. (*Id.* at PageID.5417, AR at 5160.) In doing so, Dr. Norris noted that "[c]ontemporaneous physical examination findings were inconsistent and included normal findings as well as variable findings to include L scapular winging [], intermittent paralumbar/sacral/hip tenderness, reduced [range of motion], and muscle tension." (*Id.* at PageID.5416, AR at 5159.) He also noted that the records included some issues with Plaintiff's gait, as well as occasional findings of muscle weakness. (*Id.*) He disagreed with Dr. Sandweiss's findings related to hypermobility, asserting that the examinations taken collectively did not support that conclusion. (*Id.*) Dr. Norris also stated that the degeneration in Plaintiff's sacroiliac joints and pubic symphysis would not prevent Plaintiff from "performing her occupational demands." (*Id.*) He also rejected the contention that Plaintiff had any "underlying metabolic/mitochondrial myopathy" as the etiology of her condition, because "extensive diagnostic evaluations had not identified such [a] condition." (*Id.* at PageID.5417, AR at 5160.)

17

Dr. Norris also considered results from Plaintiff's physical therapy. Though he noted that she had "low tier performance" on various tests with only minimal improvement over time, he stated that the tests were "dependent on [Plaintiff's] level of effort during testing and best describe a minimum level of capacity." (*Id.*) He also added that he would have expected Plaintiff to recover more quickly from the deconditioning that resulted from her pregnancy. (*Id.*) Given Plaintiff's travel to Florida, exercise activities, and "driving and working a few hours per week," Dr. Norris concluded that Plaintiff could perform her occupational demands. (*Id.*) Defendants informed Plaintiff that, as a result of these reviews, they would not reinstate her disability benefits. (*Id.* at PageID.5478, AR at 5221.)

Plaintiff responded to Defendants. She explained that their analyses conflated muscle strength with muscle fatigue, ignored reports of episodic spasms, misunderstood the variable nature of myopathies, and failed to understand the nature of her work. (*Id.* at PageID.5484–5485, AR at 5227–5228.) In addition to offering a point-by-point rebuttal of Dr. Norris, she stated that "[w]hile [she] would love to have a clear-cut singular diagnosis (with an equally clear treatment plan), that is not the

18

reality here as my understanding is that my disability is complicated by multiple diagnoses, many of which do not have clear confirmatory diagnostic testing available at this point in time." (*Id.* at PageID.5487, AR at 5230.) Plaintiff also objected to the conclusion that she would have assistance while performing her occupational duties, namely performing "procedures on anxious, scared, and jumpy children." (*Id.* at PageID.5491, AR at 5234.)

Dr. Swenor also provided a statement asserting that Plaintiff was incapable of performing her occupational demands as of December 1, 2021, described Plaintiff's issues with exhaustion and pain, opined that a diagnosis of mitochondrial dysfunction was "presumed," and recommended continued work restrictions. (*Id.* at PageID.5541, AR at 5284.)

Dr. Norris issued a response to Plaintiff and Dr. Swenor's submissions stating that neither one changed his mind given the lack of new or additional clinical data. (*Id.* at PageID.5545, AR at 5288.) Plaintiff responded to Dr. Norris once again. She noted the "extreme[]" rarity of her lengthy period of bedrest. (*Id.* at PageID.5618, AR at 5361 (stating

19

that the typical length of bedrest is two weeks).) She attached additional medical records.

Defendants upheld their decision to terminate Plaintiff's claims on December 7, 2022. (ECF No. 11-21, PageID.5989, AR at 5732.) They found that Plaintiff had the ability to return to work and perform her occupational duties full-time. (*Id.* at PageID.5994, AR at 5737.)

Plaintiff sued Unum on February 1, 2024. (ECF No. 1.) She sued Provident on February 6, 2024. (Case No. 24-cv-10315, ECF No. 1; *see also id.* at ECF No. 10 (Plaintiff's amended complaint against Provident).) She brings claims for disability benefits pursuant to ERISA and breach of contract.

On May 8, 2024, the Court consolidated these two cases into one action for all purposes, requiring all future filings to be made on the docket for Case No. 24-cv-10274. (ECF No. 8, PageID.203.)

## II.   Legal Standard

Following the parties' stipulation, the Court ordered that the standard of review in this litigation is *de novo*.[2] (ECF No. 24.) "When

---

[2] Plaintiff alleges in her complaints that her policies with Defendants are subject to Michigan Administrative Code Rules 500.2201 and 500.2202, the

applying a *de novo* standard in the ERISA context, the role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision" and, in doing so, the court does not defer to or presume the correctness of an administrator's decision. *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002) (citation modified). Courts do not consider any evidence outside of the administrative record during such a review. *Perry v. Simplicity Eng'g*, 900 F.2d 963, 967 (6th Cir. 1990). When conducting a *de novo* review of a denial of benefits, the Court "must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Hoover*, 290 F.3d at 809. Plaintiffs have the burden of proving their claims by a preponderance of the evidence in ERISA denial-of-benefits cases. *Javery v. Lucent Techs. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700–01 (6th Cir. 2014).

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "construe the complaint in the light

---

consequence of which is that the Court's review must be *de novo*. (ECF No. 1, PageID.3–4; Case No. 24-cv-10315, ECF No. 10, PageID.259–260.)

most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff's claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

### III.  Analysis

Plaintiff and Defendants both filed motions for judgment on the administrative record. Defendants seek judgment in their favor based on the administrative record and dismissal of Plaintiff's state-law claims. (ECF No. 15.) Defendants' Motion is fully briefed. (ECF Nos. 18, 20.) Plaintiff seeks judgment in her favor based on the administrative record, (ECF No. 16.), which is also fully briefed. (ECF Nos. 17, 19.) The core

issue raised by both Motions is whether—as of December 1, 2021—Plaintiff was disabled under her two policies.

## A.    Plaintiff's Duties

As set forth above, both policies define disability in part in terms of occupational or business duties. Plaintiff argues that Defendants misconstrued her occupational requirements by defining them as though she was a general dermatologist rather than a pediatric dermatologist. (ECF No. 16, PageID.6738, 6763–6764.) Working in pediatric dermatology is more physically demanding because of the requirements specific to working with children, she asserts. (*Id.*) The record includes a vocational analysis requested by Defendants, which describes the duties of a dermatologist, including the physical demands it involves. (ECF No. 11-11, PageID.3121, AR at 2864.) That vocational analysis mentions that Plaintiff reported her profession as a pediatric dermatologist whose duties included 32 hours of "pediatric patient care" a week. (*Id.* at PageID.3120, AR at 2863.) It defined Plaintiff's occupational requirements as consistent with a dermatologist, however. Dermatology is defined as light work, requiring occasional exertion of 20 pounds of force "and/or up to 10 pounds of force frequently, and/or a negligible

23

amount of force constantly to move objects," as well as frequent standing, walking, sitting, handling, and feeling, among other things. (*Id.* at PageID.3121, AR at 2864.) The analysis concluded that Plaintiff was performing her occupational duties "in a reduced capacity." (*Id.*)

The Unum Policy defines an insured individual's "regular occupation" for physicians as the "general or sub-specialty in which [they] were] practicing . . . *and* for which [they] are certified by the American Board of Medical Specialties" when they became disabled. (ECF No. 11-1, PageID.248, AR at 0038 (emphasis added).) The American Board of Medical Specialties recognizes pediatric dermatology, a sub-specialty in which Plaintiff is board certified. (ECF No. 16, PageID.6742 nn.6–7 (citing the American Board of Medical Specialties and Plaintiff's profile at Henry Ford Health); *see also* ECF No. 11-18, PageID.5008, AR at 4751 (Plaintiff explaining her pediatric dermatology subspeciality in her appeal and asserting that "95% of her time" at work is with children).) Based on the Unum Policy's contractual language, any vocational analysis should have focused on Plaintiff's board-certified practice area. The Unum Policy further specifies that it will consider occupations "as [they are] normally performed in the national economy instead of how

24

work tasks are performed for a specific employer at a specific location." (ECF No. 11-1, PageID.248–249, AR at 0038–0039.)

Defendants do not dispute that Plaintiff should have been assessed as a pediatric dermatologist. They assert that they viewed her as such. (ECF No. 17, PageID.6792.) As support, Defendants cite their letter outlining their review of her appeal, which states that her "occupation as a pediatric dermatologist as performed in the national economy . . . was identified as a dermatologist[.]" (ECF No. 11-21, PageID.5989, AR at 5732 (citing a code for dermatologist from an occupation database).) This statement, while far from clear or self-explanatory, appears to mean that Defendants viewed the requirements of pediatric dermatology as equivalent to those of dermatology.

In response to Plaintiff's challenges to that assessment, Defendants assert in a letter that she is "still a dermatologist with additional training in the [pediatric dermatology] subspecialty [and she] would not work alone and would have assistance while working with children." (*Id.* at PageID.5990, AR at 5733.) These assertions reflect the 2022 vocational analysis, which was undertaken at Defendants' request during Plaintiff's appeal. (ECF No. 11-19, PageID.5369, AR at 5112.) It is unclear how

25

Plaintiff being a dermatologist with additional training in pediatric dermatology is relevant to the contractual terms of the Unum Policy, which refer to board-certified practice areas.

Defendants may mean that, in their view, general dermatology and pediatric dermatology have equivalent occupational requirements. But to reach the conclusion that working with children does not change the occupational requirements of a dermatologist, they appear to rely on their consultant's claim that Plaintiff would not work alone and would never lack assistance when working with children. (*Id.*) Defendants' consultant does not cite any basis for that opinion, which Plaintiff contests. (*Id.* at PageID.5491, AR at 5234 (explaining that medical assistants in her office are shared and have multiple duties that preclude them from providing the support described by Defendants' consultant).) And while it is true that the Unum Policy's terms refer to professions in the national economy (as opposed to in specific workplaces), Defendants do not explain what basis they or their consultants have for the assumption that pediatric dermatologists working in the national economy will always work with some kind of assistance. Because that unsupported statement is Defendants' explanation for treating the

26

occupational requirements of general dermatology and pediatric dermatology as equivalent, their approach to analyzing Plaintiff's occupational requirements is flawed and inconsistent with the terms of their policies.

### B.     Plaintiff's Ability to Perform Her Duties

Defendants assert that Plaintiff fails to identify any "duties unique to a pediatric dermatologist that [she] cannot perform." (ECF No. 20, PageID.6849.) They contend that she is capable of carrying out her occupational duties. (*Id.*) Defendants argue that Plaintiff is therefore no longer disabled, so their termination of her benefits was appropriate. (ECF No. 15, PageID.6716.) In support of this argument, Defendants assert that Plaintiff's treating physicians did not believe that she was disabled, that her reported activities were inconsistent with having a disability, and that their physician consultants concluded that she was disabled. (*Id.* at PageID.6717.) Plaintiff disagrees. (ECF No. 16, PageID.6760; ECF No. 18, PageID.6817–6828.) A preponderance of the evidence supports Plaintiff's position. As set forth below, the analysis that Defendants provided as a basis to reject her claims is flawed in several respects.

27

i.    *Alleged Lack of Support from Plaintiff's Treating Physicians*

Defendants argue that Plaintiff cannot meet her burden because her treating physicians largely did not support her claim. Defendants assert that "[o]f all of her providers, only Dr. Nwagwu and Dr. Swenor continue to support [Plaintiff's] disability claim." (ECF No. 15, PageID.6720–6721.) But a closer examination reveals far more support for Plaintiff than this statement suggests. Defendants discuss the opinions of seven of Plaintiff's doctors, also arguing—unconvincingly—that the number of doctors she consulted is suspicious and undermines her claims. (*Id.* at PageID.6717.) The record reveals otherwise.

Dr. Eichenbaum, who specializes in physical medicine and rehabilitation, initially certified Plaintiff's restrictions and limitations in 2019. (ECF No. 11-2, PageID.350, AR at 0093.) Plaintiff called Defendants in 2020 to discuss switching doctors, because felt Dr. Eichenbaum was not making decisions in her best interests. (ECF No. 11-7, PageID.1828, AR at 1571.) Plaintiff's sense that Dr. Eichenbaum was no longer someone she wanted to work with arose because Dr. Eichenbaum called her and, without any previous conversation about a change in treatment strategy or other new information, said she "had

28

talked to her partners and couldn't see justifying [Plaintiff] being out [of work due to her symptoms] beyond 06/01/20." (*Id.*) Plaintiff was taken aback, because her previous return to work had led to serious setbacks, she hadn't been receiving treatment for 8 weeks due to the COVID pandemic, and Dr. Eichenbaum was expressing what Plaintiff felt was a sudden, unjustified shift in opinion. (*Id.*)

The record reveals that Plaintiff felt her relationship with Dr. Eichenbaum had broken down and that Dr. Eichenbaum expected to discontinue certifying Plaintiff's restrictions and limitations, but it does not explain *why* Dr. Eichenbaum expressed that opinion. The conversation between Plaintiff and Dr. Eichenbaum—a conversation that Plaintiff voluntarily described to Defendants and that is not a part of the record—does not support anything more than speculation about whether Plaintiff was disabled. The same goes for Plaintiff's decision to change doctors, which is likely why that decision did not lead to a termination of benefits.

Dr. Mattson saw Plaintiff in June of 2020 and certified new work restrictions for three months. (ECF No. 11-9, PageID.2300, AR at 2043.) She renewed those restrictions on December 22, 2020. (ECF No. 11-13,

PageID.3329, AR at 3072.) At that time, Dr. Mattson expressed hope that Plaintiff's restrictions could eventually be "liberalized," but she noted that would "[d]epend[] on her functional status." (*Id.*) A few months later, Plaintiff changed doctors again, because Dr. Mattson completed her residency and moved on to a different position. (*Id.* at PageID.3686, AR at 3429.) That doctor, Dr. Nakamura, referred her to another doctor (Dr. Richardson) due to his specialization. (*Id.* at PageID.3796, AR at 3539.) But Plaintiff never established an ongoing relationship with Dr. Richardson, because, she explains, he went on leave. (ECF No. 11-19, PageID.5343, AR at 5086.) Again, none of these changes reveal a lack of support for Plaintiff's work restrictions.[3] Indeed, Dr. Nakamura told Defendants in July 2021 that Plaintiff "would not have the endurance to sustain work activity" and that despite possibly having "normal strength during an office visit, she would fatigue quickly with repetitive activity." (ECF No. 11-13, PageID.3796, AR at 3539.)

---

[3] Another doctor, Dr. Zajdel, who had last seen Plaintiff in October 2020, stated in February 2021—in response to an inquiry from Defendants—that she was not managing Plaintiff's care. (ECF No. 11-13, PageID.3436, AR at 3179.) Again, this statement does not shed any light on Plaintiff's condition. All it shows is that Dr. Zajdel was no longer Plaintiff's treating physician.

Plaintiff's next doctor, Dr. Nwagwu, also supported her restrictions and limitations. (ECF No. 11-19, PageID.5338, AR at 5081.) So too did Dr. Sandweiss in May 2022, (ECF No. 11-17, PageID.4972, AR at 4715), though he deferred to other of Plaintiff's doctors in September 2022 when Defendants reached out. (ECF No. 11-19, PageID.5403, AR at 5146.)

Dr. Swenor also supports Plaintiff. (ECF No. 11-17, PageID.4978–4979, AR at 4721–4722.) Dr. Swenor's initial non-response to Defendants, offered through an assistant, was that Dr. Nwagwu was Plaintiff's doctor who was certifying her restrictions and limitations, so she would not be responding to the inquiry. (ECF No. 11-16, PageID.4437, AR at 4180; *see also id.* at PageID.4430, AR at 4173 (Plaintiff stating that she had not asked Dr. Swenor to certify restrictions and limitations given Dr. Swenor's specialization).) Defendants are incorrect that Dr. Swenor "changed her position," insofar as they mean that she changed her mind about whether Plaintiff's restrictions and limitations were valid. (ECF No. 15, PageID.6720.) Dr. Swenor did change her mind about whether it was appropriate to respond to Defendants' inquiries, though that reveals nothing about Plaintiff's medical condition.

31

Overall, Plaintiff's treating physicians supported her restrictions and limitations. Years before her claims were terminated, Plaintiff reported that one doctor might have raised doubts about her restrictions, but we have scant detail about what basis—if any—that doctor had for that opinion. Otherwise, Plaintiff's doctors support her position or state no opinion about it.

Defendants also invite the Court to conclude that Plaintiff's decisions to change providers were due to her "own treating physicians declin[ing] to continue to support her claim." (ECF No. 15, PageID.6717.) Plaintiff changed providers due to her disagreements with Dr. Eichenbaum. (ECF No. 11-7, PageID.1828, AR at 1571) Nothing about that change raises questions about Plaintiff's credibility, though. Nor does it suggest she ever changed physicians for cynical or deceptive reasons—as opposed to because she wanted to get stronger so that she would get well and be able to return to work. The only reason Plaintiff's disagreement with Dr. Eichenbaum is part of the record is because Plaintiff volunteered that information to Defendants, stating to them that "her husband is an attorney and didn't like that she was going to call [Defendants], because [Defendants] are just going to deny people, but

she wants to be transparent." (*Id.*) After working with Dr. Eichenbaum, Plaintiff's other decisions to change doctors arose from circumstances like her doctors graduating, going on medical leave, or being inconveniently located. The explanations in the record for Plaintiff's decision to see multiple doctors or to make changes in her approach do not indicate gamesmanship but are consistent with her attempts to find treatment for recurrent and troublesome symptoms. Defendants' argument about lack of support from her physicians therefore fails.

ii.    *Plaintiff's Activities*

Defendants also assert that Plaintiff's activities show that she is not disabled. (ECF No. 15, PageID.6721.) They point to the following activities:

- walking

- swimming

- pilates/ELDOA techniques with a therapist

- taking extended vacations

- driving a car

- taking care of her children

- appealing the denial of her disability benefits

33

(ECF No. 15, PageID.6721; ECF No. 17, PageID.6789–6790.)

Many of the activities Defendants present as evidence of Plaintiff's lack of disability were in fact recommended by or discussed with her physical therapists and doctors. (*See, e.g.*, ECF No. 11-9, PageID.2530, AR at 2273 (physical therapist recommending "aquatic activity"); ECF No. 11-17, PageID.4813, AR at 4556 (doctor recommending swimming); ECF No. 11-13, PageID.3334, AR at 3077 (doctor's note explaining that ELDOA is part of Plaintiff's physical therapy); ECF No. 11-17, PageID.4933, AR at 4676 (doctor's note reflecting Plaintiff discussing taking walks at an appointment).) These activities are also often referred to briefly in patient notes, offering little to no indication of their intensity.

Defendants also offer scant explanation for how—based on such brief references—the Court could possibly conclude that these activities "show [Plaintiff] can perform the duties of her occupation as a pediatric dermatologist." (ECF No. 15, PageID.6721.) They do not compare these activities with the requirements of Plaintiff's occupation but instead appear to assume that it is obvious that activities like Plaintiff's appealing the denial of her benefits are equivalent to activities involved in being a pediatric dermatologist. Putting aside the perversity of holding

a disability claimant's self-advocacy against them, the administrative record does not include information about how long it took her to write her appeal documents, whether she took breaks, whether she received assistance (and if so, how much), or how such an activity compares to the work she did as a pediatric dermatologist. The Court would have to make speculative leaps and fill in gaps in the record to conclude that the activities involved in appealing a denial of disability benefits is evidence of a lack of disability.[4] The same goes for the rest of Defendants'

---

[4] The problems with Defendants' approach to these issues are especially evident in their attempt to bring extra-record evidence about Plaintiff's activities to the Court's attention. To justify this offering, Defendants assert that Plaintiff wrongly refers to facts outside the administrative record. (ECF No. 17, PageID.6781.) Based on this allegation, they argue that "[i]f Dr. Jahnke is going to base her argument on extra-record evidence, then defendants should be allowed to introduce evidence outside the administrative record as well, including evidence of Dr. Jahnke's recent medical research and social activities." (*Id.*) They cite nothing in support of this two-wrongs-make-a-right theory of ERISA litigation. Nonetheless, they proceed to offer three website URLs that respectively link to a co-authored article by Plaintiff that was published in 2024, a 28-minute YouTube video of Plaintiff discussing medical research uploaded in 2022, and an expired section of the website for JARC, an organization in Oakland County that supports individuals with developmental disabilities. (*Id.* at PageID.6781 n.2.) Plaintiff responds and denies offering any extra-record evidence, thus undermining Defendants' purported justification for ignoring the requirement that evidence be in the administrative record. (ECF No. 19, PageID.6834–6835.) She also explains her role in the academic research Defendants introduce, as well as her limited role in a charity event, including the accommodations she received when attending the event. (*Id.* at PageID.6834–6836.) Defendants made no further mention of this evidence in their reply. (ECF No. 20.)

conclusory arguments that Plaintiff leads "an active life" and therefore is not disabled under their policies. (ECF No. 15, PageID.6721.) The Court therefore declines to adopt Defendants' argument that Plaintiff's activities reveal a lack of disability.

### iii.    Defendants' Medical Consultants' File Reviews

Several doctors and other medical professionals reviewed Plaintiff's file at Defendants' request. Defendants cite the file reviews completed by three doctors they retained: Dr. Antaki, Dr. Green, and Dr. Norris. None of them examined Plaintiff. The Sixth Circuit has set forth that

> "[T]here is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician." *Calvert v. Firstar Fin. Inc.,* 409 F.3d 286, 297 n.6 (6th Cir. 2005). However, we have held that the failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, "raise[s] questions about the thoroughness and accuracy of the benefits

---

Defendants introduced this extra-record evidence despite admittedly being aware that it would be improper for the Court to consider it—their strained reliance on Plaintiff's allegedly improper citations notwithstanding. Putting that to the side, even if the websites Defendants cited could be considered, they do not shed any light on the relevant issues in this case. As with much of the argument about Plaintiff's activities, Defendants simply offer links to some websites without any argument about how it relates to or compares to Plaintiff's occupational duties or any other language in the relevant contract. These websites are provided as though it is self-evident that Plaintiff's activities demonstrate that she is not disabled. But it is by no means obvious that occasional academic research or charitable activity is inconsistent with Plaintiff's claims. This evidence is not properly before the Court.

determination." *Helfman,* 573 F.3d at 393 (quoting *Calvert,* 409 F.3d at 295).

*Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 550 (6th Cir. 2015). The Sixth Circuit has "found fault with file-only reviews" when file reviewers make credibility determinations about claimants they have never examined. *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013) (citing *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008)).

### a.   Dr. Antaki

Dr. Antaki reviewed Plaintiff's file in March 2021 and provided an addendum report in November 2021, concluding both times that the restrictions and limitations Plaintiff's doctors had recommended were not supported. (ECF No. 11-13, PageID.3470, AR at 3213; ECF No. 11-16, PageID.4393, AR at 4136.) In his March 2021 report, Dr. Antaki noted a lack of nutritional deficiencies aside from a vitamin D deficiency. (ECF No. 11-13, PageID.3470–3471, AR at 3213–3214.) He denied that Plaintiff's coccyx pain could have precluded her from "the occupational demands of frequent sitting," because she did not have "painful BM, urinary symptoms, or pelvic floor pain," nor did imaging reveal bone or muscle abnormalities. (ECF No. 11-13, PageID.3471, AR at 3214.) Dr.

37

Antaki also denied that stiffness resulting from myofascial restrictions could have prevented Plaintiff from doing her occupational duties. (*Id.*) That opinion is based on her initially being able to stand for an hour or two after her pregnancy, being able to lift her children "when necessary," being able to lift light or medium weights if "conveniently placed," and stating that she had ongoing childcare and work responsibilities. (*Id.*) He also stated that he did not think the record supported the presence of any "neuromuscular, metabolic, or rheumatologic condition." (*Id.*) Dr. Antaki's November 2021 addendum considered further records, but found that Plaintiff had "intact strength, [range of movement], and absence of atrophy," which he believed to be inconsistent with restrictions and limitations being supported. (ECF No. 11-16, PageID.4394, AR at 4137.)

Plaintiff responds that Dr. Antaki ignored her physical therapy records and the fatigue that impacted her ability to carry out her occupational duties. (ECF No. 18, PageID.6820–6821.) She also argues that he wrongly analyzed her occupation as that of a dermatologist rather than a pediatric dermatologist. (*Id.* at PageID.6821.)

38

Plaintiff is incorrect when she asserts that Dr. Antaki ignored her physical therapy records. (*See* ECF No. 11-16, PageID.4393, AR at 4136 (quoting from an April 16, 2021 physical therapy note).) But Dr. Antaki does not analyze Plaintiff's fatigue in any detail; he only references reduced endurance briefly. That means that although he suggests that Plaintiff can do the activities required by her occupation, he does not explain how she can do them on the repetitive and sustained basis that full-time employment requires. (*See* ECF No. 11-13, PageID.3471, AR at 3214.) This gap in his analysis means he does not adequately address a central aspect of Plaintiff's argument for qualifying as disabled. Further, as set forth above, Defendants approach to identifying Plaintiff's occupation was indeed flawed. Dr. Antaki's analysis appears to be consistent with Defendants' definition of Plaintiff's occupation. (*See, e.g.*, ECF No. 11-16, PageID.4393, AR at 4136.)

### b.    *Dr. Green*

Another doctor provided a paper review at Defendants' request. Dr. Green agreed with Dr. Antaki that Plaintiff's recommended restrictions and limitations were unsupported. (ECF No. 11-16, PageID.4420–4421, AR at 4163–4164.) Dr. Green spends most of his two-page review

summarizing medical notes. (*Id.*) He concludes, that "[c]onsidering the claimant['s] self-reported symptoms as well as all clinically relevant information I would agree . . . [Plaintiff] does not have any dangerous pathology or significant abnormality preventing the ability to function within the occupational demands described." (*Id.* at PageID.4421, AR at 4164.)

Plaintiff argues that Dr. Green also ignores her specialization as a pediatric dermatologist, offers vague statements, and impermissibly questions Plaintiff's credibility based on a file review. (ECF No. 18, PageID.6821–6822.) Even putting these objections aside, Dr. Green's analysis is cursory, and the lack of explanation for his views means that his analysis does not offer support for Defendants' position beyond what is already in Dr. Antaki's analysis.

### c.    Dr. Norris

During the appeal, Defendants asked Dr. Norris to conduct a file review. He provided a report in October 2022, (ECF No. 11-19, PageID.5414–5418, AR at 5157–5161), and an addendum to his report in November 2022. (*Id.* at PageID.5545–5547, AR at 5288–5290.)

In the October 2022 report, Dr. Norris rejected Plaintiff's claims of disability. (*Id.* at PageID.5414, AR at 5157.) He opined that "[e]xtensive neuromuscular diagnostic evaluation has not identified a converging diagnosis that would explain [Plaintiff's] reported [symptoms] and variable findings on physical examinations." (*Id.* at PageID.5417, AR at 5160.) He also asserted that there was a lack of evidence of metabolic disorders, mitochondrial myopathy, or other related disorders. (*Id.*) Although Dr. Norris recognized Plaintiff's "low tier performance" on physical therapy tests, he noted that "[t]hese tests [] are dependent on [Plaintiff's] level of effort during testing and best describe a minimum level of capacity." (*Id.*) After receiving a response from Dr. Swenor and from Plaintiff, Dr. Norris issued an addendum report where he continued to maintain that Plaintiff's claims should be denied. He rejected the arguments in Dr. Swenor and Plaintiff's responses, because they did not add any "additional clinical data" into the record. (*Id.* at PageID.5545, AR at 5288.)

Plaintiff argues that Dr. Norris's area of expertise is not related to Plaintiff's medical conditions, he was not informed about her occupation

as a pediatric dermatologist, and he ignored the issues Plaintiff raised with his report in her responses to it. (ECF No. 18, PageID.6823.)

The argument that Dr. Norris does not have the proper expertise is conclusory and insufficiently explained by Plaintiff. Dr. Norris also appears to have been aware of her position that her work as a pediatric dermatologist was more physically demanding than general dermatology. (*See* ECF No. 11-19, PageID.5410–5411, 5413, AR at 5153–5154, 5156.) It is, however, true that his analysis aligns with Defendants' flawed approach to Plaintiff's occupation, much like Defendants' other medical consultants.

Dr. Norris does not respond to Plaintiff's criticism of his analysis, except to say she does not present any new clinical data in support of her objections. (*Id.* at PageID.5545, AR at 5288.) While Plaintiff is a doctor, she works in pediatric dermatology and not in the areas of medicine relevant to this litigation. Still, some of her objections to Dr. Norris's opinions are substantive and cite to medical literature. (*See, e.g.*, *id.* at PageID.5484, AR at 5227.) His choice not to respond to her makes it more difficult for the Court to assess Dr. Norris's addendum and raises questions about whether he has adequate answers to her criticisms. But

on their own, Plaintiff's objections to Dr. Norris during her appeal are not enough for the Court to reject his analysis.

Dr. Norris's treatment of Plaintiff's physical therapy tests, however, is problematic. The Sixth Circuit has set forth that it is acceptable for a physician to review a claimant's file without a physical examination, but such a review is inadequate insofar as it "include[s] critical credibility determinations" about a claimant. *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 297 n.6 (6th Cir. 2005). That rule makes good sense, given that physicians who do not physically examine a patient are in no position to assess their credibility. While Dr. Norris does not assess Plaintiff's credibility, he makes a parallel error when he opines about her effort. Specifically, he recognizes Plaintiff's "low tier performance" on various tests with only minimal improvement over time but opines that the tests were "dependent on [Plaintiff's] level of effort during testing and best describe a minimum level of capacity." (ECF No. 11-19, PageID.5417, AR at 5160.) But Dr. Norris does not explain why it can be assumed that Plaintiff did not exert her full effort in these tests, nor is there any reason to conclude that they only represent her minimum capacity, as opposed to her maximum or average capacity. As someone

43

performing a file review, he is no position to assess or assume Plaintiff's level of effort. That is especially the case when her physical therapists do not note any lack of effort and, in fact, monitor her effort carefully to avoid overexertion that would lead to "muscle failure and reduced functional capacity." (ECF No. 11-17, PageID.4969, AR at 4712.) This opinion represents an inadequacy in his analysis, which leads him to discount objective data that is included in Plaintiff's file.

Dr. Norris asserts that Plaintiff's problems should have resolved by the time of his review. (ECF No. 11-19, PageID.5417, AR at 5160.) He also opines that the underlying cause of Plaintiff's symptoms has not been identified. (*Id.*) Neither point shows that Plaintiff's symptoms have in fact resolved. Defendants' position is that Plaintiff was disabled for a significant period, but that by December 2021, that was no longer the case. (ECF No. 15, PageID.6726.) Ultimately, whether Plaintiff demonstrates that her disability continued past when her benefits ended depends on the evidence in the record—not on Dr. Norris's unsupported assessments of her effort on tests or his expectations of the normal length of a disability like Plaintiff's.

       *iv.*     *Plaintiff's Treating Physicians and Physical*
                  *Therapists' Opinions*

Plaintiff argues that the opinions of her treating physicians and therapists meet her burden and should outweigh the medical file reviews offered by Defendant. (ECF No. 16, PageID.6760.) When it comes to the opinions of treating physicians

> "[p]lan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003). However, they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834.

*Shaw*, 795 F.3d at 548.

Plaintiff's position is that she suffers from "generalized weakness[], deconditioning[], decreased functional mobility and endurance[], and an inability to sustain sitting, standing, walking, bending, or squatting." (ECF No. 16, PageID.6741.) Those functional issues are the basis for her disability claim. (*Id.*) Plaintiff points to ample evidence to demonstrate that after December 1, 2021—when her benefits ended—she qualified as disabled under her policies.

45

*a.   Presence of Sickness or Injury*

Plaintiff does not have a clear diagnosis for her symptoms, which Defendants assert means that Plaintiff does not meet her burden. (ECF No. 17, PageID.6782–6783.) They argue that her policies only provide for benefits when a claimant cannot perform their duties *due to sickness or injury*. (*Id.*) To satisfy this requirement, they contend, Plaintiff must show she has a sickness or injury causing her limitations by identifying the relevant sickness or injury—not just the symptoms with which she is afflicted. (*Id.*)

The record does not reveal one specific or distinct cause for Plaintiff's symptoms. Plaintiff points out that mitochondrial dysfunction is mentioned throughout the administrative record. But, as she acknowledges, that diagnosis has neither been confirmed nor ruled out. (ECF No. 18, PageID.6812–6813.) Dr. Swenor states that Plaintiff has a "diagnosis of presumed mitochondrial dysfunction." (ECF No. 11-19, PageID.5541, AR at 5284.) A 2022 evaluation performed at a clinic focused on mitochondrial disease includes the remark that "[a] primary mitochondrial myopathy is in the differential, but it is not strongly suggested." (*Id.* at PageID.5314, AR at 5057.) That same evaluation

46

states that Plaintiff's "etiological differential includes metabolic myopathies, severe deconditioning, myasthenia gravis, and chronic fatigue syndrome." (*Id.*) That analysis does not state that Plaintiff has no sickness or injury—instead it states that there are several possible diagnoses that might be causing her symptoms. That is consistent with what Plaintiff's treating physicians state in their letters of support. (*See, e.g.*, ECF No. 11-19, PageID.5328, AR at 5071 (Dr. Sandweiss stating that Plaintiff "suffers from multiple medical conditions that require her to have a markedly reduced work schedule"); *id.* at PageID.5340, AR at 5083 (Dr. Zajdel stating that "nutritional/metabolic and rheumatologic conditions should be ruled out" and describing Plaintiff's case as "complex").)

Neither ERISA nor the Unum and Provident Plans support the requirement Defendants attempt to impose on Plaintiff.

ERISA does not require that a plaintiff show a particular etiology to prove they are disabled. *See Gaylor v. John Hancock Mut. Life Ins.*, 112 F.3d 460, 467 (10th Cir. 1997) (holding that the plaintiff was disabled based on clinical physical examinations even though "no particular etiology was identified through clinical and laboratory diagnostic

means"); *see also Lesser v. Reliance Standard Life Ins. Co.*, 385 F. Supp. 3d 1356, 1375 (N.D. Ga. 2019) ("It is wrong and unreasonable, however, to require the claimant to furnish proof of the root cause of his illness when it is not one that is easily diagnosed by objective tests and where there is no evidence that the claimant is malingering.").

Defendants argue that their policies require identification of the etiology of her symptoms, however. (ECF No. 20, PageID.6849–6850.) They cite language from their policies that defines disability as a limitation that is "due to . . . sickness or injury." (ECF No. 11-1, PageID.226, AR at 0016 (Unum Policy) (emphasis omitted); *see also* ECF No. 12-1, PageID.6056, AR at 0011 (Provident Policy defining disability as being due to "Injuries or Sickness").) The Unum Policy defines injury as "a bodily injury that is the direct result of an accident and not related to any other cause" and sickness is defined as "illness or disease." (ECF No. 11-1, PageID.247, 249, AR at 0037, 0039.) The Provident Policy defines injury as "accidental bodily injuries" and sickness as "sickness or disease." (ECF No. 12-1, PageID.6052, AR at 0007.)

Defendants' argument reads a great deal into the policy language that they cite. They assume that it is not enough to present evidence that

48

a sickness or injury—rather than something else—is causing a claimant's symptoms. Defendants assert that a claimant must definitively identify a specific sickness or injury. But that is an unreasonably limited reading of their policies that is not supported by the general language they contain. The plain reading of these policies is that the record must demonstrate that sickness or injury is causing a claimant's limitations rather than some other cause. A claimant who cannot work because they lost their professional license for misconduct is not, for instance, disabled under these policies. (*See* ECF No. 11-1, PageID.226, AR at 0016 (Unum Policy explaining that "loss of a professional or occupational license or certification does not, in itself, constitute disability").) If a claimant cannot work due to a natural disaster destroying their office, that would also not count as a disability under these policies. But if a claimant is afflicted by a new or difficult-to-diagnose sickness or injury, the policy language would not preclude making a claim. The evidence would have to show that an injury or sickness was the cause of a claimant's limitations, even if it had not yet been determined which specific diagnosis was the cause of those limitations. If Defendants had intended

a more onerous requirement, they could have expressly required it in the policies they drafted.

Defendants rightly point out that they can reasonably require "objective medical evidence of disability." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007). That is a separate issue from whether Plaintiff has a definitive and final diagnosis or can offer a clear etiology. To meet the requirements of the relevant policies, Plaintiff must offer evidence demonstrating her condition is a result of sickness or injury rather than something else. So long as she meets that requirement, she need not have conclusively determined the etiology of her symptoms. Doing so is not necessary for determining that she is disabled due to sickness or injury. *See Meinke v. Comput. Sci. Corp.*, No. 3:02-cv-286, 2004 WL 5345274, at *11 (S.D. Ohio Sep. 20, 2004) (explaining that disagreement over etiology and lack of clarity about the "exact nature" of or "medical term" for a condition does not preclude a plaintiff being disabled under a policy).

### b.  *Plaintiff's Supporting Opinions and Evidence*

Plaintiff provides objective medical evidence of her disability. The record includes more than her subjective reports. As the Sixth Circuit has

explained, "a treating physician's notes detailing the functional capabilities of a patient are objective evidence." *Zuke v. Am. Airlines, Inc.*, 644 F. App'x 649, 654 (6th Cir. 2016). Observations of external indicators of pain and "deviations in posture and movement patterns" are also objective evidence. *Brooking v. Hartford Life & Accident Ins. Co.*, 167 F. App'x 544, 549 (6th Cir. 2006). Further, when a defendant in a denial-of-benefits case "categorically states that there is no objective evidence when in fact there is such evidence," that weighs against the defendant. *Zuke*, 644 F. App'x at 654.

Here Defendants wrongly claim that "neither [Dr. Nwagwu nor Dr. Swenor] can point to any clinical data to support their conclusion that [Plaintiff] remained disabled." (ECF No. 20, PageID.6847.) In fact, both of those doctors wrote letters of support and their notes in the administrative record document clinical testing and observations supporting their opinions about Plaintiff's limitations.

Just weeks before Plaintiff's benefits were terminated, Dr. Nwagwu completed an attending physician statement supporting her restrictions. The primary diagnosis he offered was coccydynia with secondary diagnoses of myalgia, pelvic pain, low back pain, and cervicalgia. (ECF

51

No. 11-16, PageID.4355, AR at 4098.) He certified Plaintiff's restrictions and limitations through the end of 2022, stating she is "limited by difficulty with bending, twisting, reaching, [and] limited walking tolerance." (*Id.* at PageID.4356, AR at 4099.) Dr. Nwagwu performed certain "manual medicine screening evaluations" that are described in his notes, which document Plaintiff's deficits. (*See, e.g.*, ECF No. 11-15, PageID.4223, AR at 3966; ECF No. 11-17, PageID.4896–4897, AR at 4639–4640.)

Dr. Swenor also wrote a letter supporting Plaintiff's appeal. In that letter, she refers to an April 5, 2022 examination of Plaintiff, which she states was consistent with decreased range of motion, core instability, and tenderness. (*Id.* at PageID.4979, AR at 4722; *see* also ECF No. 11-18, PageID.5224, AR at 4967 (progress note about April 5, 2022 examination stating the same).)

Physical therapists also documented Plaintiff's limitations. Plaintiff cites one March 22, 2022 examination note that states she was "in the bottom 5% for her age" on a walking test, indicating significant "impairments in endurance," and "in the bottom 10% of her age" on tests related to "functional strength." (ECF No. 11-18, PageID.5033, AR at

4776.) The physical therapist stated that she "demonstrates deconditioning and impaired activity tolerance limiting her ability to tolerate" her daily activities, including her occupational requirements. (*Id.*) Another physical therapist noted "functional strength deficits" and issues with fatigue as well. (ECF No. 11-19, PageID.5325, AR at 5068; *see also* ECF No. 11-20, PageID.5666, AR at 5409 (physical therapy progress note describing issues with weakness and fatigue.)

Defendants argue that her physical therapists found that she had muscle weakness but two of her treating physicians found she had normal muscle strength. (ECF No. 17, PageID.6785.) These differing results do not address Plaintiff's issues with fatigue and endurance, however. And it is not clear the results are, indeed, inconsistent. One of Plaintiff's physical therapists notes that her deficits were "most apparent when observing her walking patterns, stair climbing and balance tasks." (ECF No. 11-19, PageID.5325, AR at 5068.) Dr. Norris does not address whether these providers used the same testing methods and, if not,

whether there was any reason to weigh certain test results more heavily than others.[5] (*Id.* at PageID.5416, AR at 5159.)

Plaintiff has demonstrated that her issues with fatigue and endurance prevent her from performing her occupational duties. At the time her benefits were denied, her providers documented objective support for her claim, including with respect to fatigue and endurance. Defendants' file reviews, which, as set forth above, were flawed in a variety of important respects, do not undermine that conclusion. Plaintiff was entitled to benefits under the two policies. Accordingly, Plaintiff's Motion is granted.

> ### v.   *Plaintiff's State-Law Claims*

Defendants also argue that Plaintiff's state-law breach-of-contract claims must be dismissed, because "(1) ERISA preempts [those claims], and (2) [Plaintiff] lacks standing to bring them." (ECF No. 15, PageID.6724.) Plaintiff did not respond to these arguments. Such a non-response constitutes waiver of a claim. *Brown v. VHS of Mich., Inc.*, 545

---

[5] Plaintiff argues in one of her responses that the tests performed by physicians and physical therapists differed such that they captured different aspects of her physical condition—rather than revealing inconsistencies. (ECF No. 11-19, PageID.5484, AR at 5227.)

F. App'x 368, 372 (6th Cir. 2013) (collecting cases). Accordingly, Defendant's Motion is granted with respect to Plaintiff's state-law claims, which are dismissed.

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion. (ECF No. 15.) It GRANTS Defendants' Motion with respect to Plaintiff's state-law breach-of-contract claims but otherwise DENIES Defendant's Motion. The Court GRANTS Plaintiff's Motion. (ECF No. 16.)

This order does not close the case. The parties are ordered to submit a proposed judgment within 14 days of this order. If the parties cannot reach an agreement on the form of a proposed judgment, they may file appropriate briefing within 21 days of this order.

IT IS SO ORDERED.

Dated: September 9, 2025        s/Judith E. Levy
Ann Arbor, Michigan             JUDITH E. LEVY
                                United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 9, 2025.

<u>s/William Barkholz</u>
WILLIAM BARKHOLZ
Case Manager